Electronically FILED by Superior Court of California, County of Los Angeles on 12/10/2020 11:40 AM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Perez,Deputy Clerk

Case 2:21-cv-01526-FMO-PD   Document 1-2 47226 Filed 02/19/21   Page 1 of 22   Page ID #:43

Assigned for all purposes to: Spring Street Courthouse, Judicial Officer: Stephen Goorvitch

Jody C. Moore, 192601
Gregory L. Johnson, 177889
Joanna A. Hutchins, 307058
**JOHNSON MOORE**
100 E. Thousand Oaks Boulevard, Suite 229
Thousand Oaks, CA 91360
Telephone:      (805) 988-3661
Facsimile:      (805) 494-4777

Attorneys for Plaintiff

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES

| | |
|---|---|
| ANNE PALAMIDES, by and through her Guardian ad Litem, EMILY MATCHETT,<br><br>Plaintiff,<br><br>vs.<br><br>SILVERADO SENIOR LIVING, INC.; SILVERADO SENIOR LIVING MANAGEMENT, INC., SUBTENANT 330 NORTH HAYWORTH AVENUE, LLC; LOREN SHOOK, individually; JASON RUSSO, individually; and Does 1-25, inclusive,<br><br>Defendants. | CASE NO.:  20STCV47226<br><br>**COMPLAINT FOR DAMAGES:**<br>1. **Dependent Adult Abuse and Neglect (Welf. & Inst. Code, § 15600, *et seq.*)**<br>2. **Negligence** |

Plaintiff hereby alleges as follows:

Plaintiff ANNE PALAMIDES, by and through her Guardian ad Litem, EMILY MATCHETT hereby bring this action for damages against Defendants SILVERADO SENIOR LIVING, INC.; SILVERADO SENIOR LIVING MANAGEMENT, INC., SUBTENANT 330 NORTH HAYWORTH AVENUE, LLC; LOREN SHOOK, individually; and JASON RUSSO, individually; hereafter collectively referred to as the "SILVERADO DEFENDANTS."

## **INTRODUCTION**

1.    SILVERADO SENIOR LIVING - BEVERLY PLACE has had one of the worst outbreaks of COVID-19 in any assisted living facility in California: thirteen (13) residents and one (1) staff member are now **dead** from coronavirus; a total of fifty-eight (58) residents have

1   been infected, along with thirty-nine (39) staff members (97 infections in total); while other

2   COVID-19 related deaths remain hidden from the public.[1] Only one assisted living facility in the

3   state of California (out of 395 facilities) reported higher numbers. This case involves one of the

4   residents who became infected.

5       2.   ANNE   PALAMIDES   (at   right)

6   (hereafter, "MS. PALAMIDES") contracted

7   COVID-19 while living at SILVERADO

8   SENIOR LIVING - BEVERLY PLACE in

9   April 2020.



10      3.   MS.   PALAMIDES   did   not   get

11  infected with the coronavirus due to some

12  unforeseen act-of-God.  Rather, she became

13  infected because the corporate decision-

14  makers chose to skirt safety and infection

15  control standards.   This case is about the decisions made by the corporate directors of

16  SILVERADO SENIOR LIVING - BEVERLY PLACE that invited the coronavirus to walk

17  through its proverbial front doors (or through the elevator from the parking garage, as the facts

18  will show).

19      4.   In this case, the corporate directors of an assisted living home for the elderly made the

20  choice to close its doors to family and non-essential personnel, claiming it was too dangerous to

21  allow anyone inside the building other than the residents and staff who care for them. The

22  SILVERADO DEFENDANTS were aware that any person could inadvertently bring the

23  coronavirus into its building and fatally infect its resident population.

24

25

26

27
_____

[1] *COVID-19 Positive Cases in Adult and Senior Care Facilities*, COVID-19 Information and Resources,

28  <https://www.cdss.ca.gov/inforesources/cdss-programs/community-care-licensing/covid-19-information-and-resources> [as of Dec. 9, 2020].

- On March 10, 2020 the SILVERADO DEFENDANTS required all visitors at SILVERADO SENIOR LIVING - BEVERLY PLACE to stop at the front desk for screening.
- On March 12, 2020, the SILVERADO DEFENDANTS asked all family and visitors to withhold visits for 2 weeks.
- On March 13, 2020, the SILVERADO DEFENDANTS explained to family members that "we are putting our residents at significant risk by exposing them to what may come through the front door." The SILVERADO DEFENDANTS limited all visitors until April 1st and further instructed: "do not enter if you have recently traveled to an area with an outbreak of Coronavirus…"
- On March 15,2020, the SILVERADO DEFENDANTS prohibited all family and private duty sitters/resident companions from entering the building. Only SILVERADO SENIOR LIVING - BEVERLY PLACE associates and healthcare professionals were allowed in the building.  The policy prohibiting outside visitors and residents was reiterated on March 16, 2020 and March 17, 2020.

5.   At the same time, those same corporate directors made the choice to admit a (1) new resident (2) who would have to fly on a commercial airplane (3) to Los Angeles from New York, the epicenter of the virus, in the midst of the deadly coronavirus pandemic, (4) without screening, testing, or isolation.  In allowing the new resident to be admitted, the corporate directors also allowed his family (who also flew from London to New York, and then New York to Los Angeles) into the building, when other families were locked out.

- On March 19, 2020, the SILVERADO DEFENDANTS chose to admit a new resident who flew on a commercial flight from Manhattan to Los Angeles and came directly to SILVERADO SENIOR LIVING - BEVERLY PLACE's memory care unit on the third floor, without any period of isolation or quarantine. He was accompanied by a daughter, who also flew on that flight with him, and who had flown to New York from London. Once in the building, he was not quarantined and not tested for the virus.

**COMPLAINT FOR DAMAGES**

- On March 20, 2020, he was symptomatic with cough, fever and lethargy. His symptoms were alarming enough for the facility to call 911, where he was taken to Cedars-Sinai Medical Center. The next day, he tested positive for the coronavirus.
- There were no positive cases at the facility before the admission of this man from New York, hereafter "Patient Zero."

6.  This decision to admit Patient Zero put at risk each of the existing residents and staff, for no other purpose than to make money. It was undertaken in knowing and conscious disregard of the risk of harm to the residents of SILVERADO SENIOR LIVING - BEVERLY PLACE and its staff.

7.  There was no emergency that required this man to fly from New York to Los Angeles for care (other than a desire to leave the city where the virus numbers were climbing at an alarming rate). There was nothing special about the care being provided at this assisted living facility that could not have been provided elsewhere (or at home). The man's apparent need for care stemmed from "mild dementia" and he was moved into the third floor of SILVERADO SENIOR LIVING - BEVERLY PLACE, which was designated for the most independent and high-functioning residents.

8.  Once he arrived at the facility, the man was not tested for coronavirus and he was not quarantined. By the following day, he had symptoms alarming enough for the facility to call 911, where he was taken to Cedars-Sinai Medical Center. The next day, he tested positive for the coronavirus. There were no positive cases at the facility before the admission of Patient Zero.

9.  The 32-year old nurse who cared for him on the night of his arrival, was infected and died. Within roughly one month of his admission, 3 residents and one staff member died of COVID-19.

10.  The virus continued to spread, unabated, to at least 97 reported infections, and counting. While the virus was spreading, family and private caregivers remained locked out. They could not see their loved ones or advocate for care. With limited interactions over Facetime and by phone, and by families communicating with one another, they learned that Defendants intentionally concealed and made misrepresentations to residents and their families regarding

**COMPLAINT FOR DAMAGES**

their loved one's exposure to the virus, all the while failing to implement proper isolation and screening procedures to protect residents from cross-contamination.  Defendants also intentionally concealed and made misrepresentations to its staff about the need for, and efficacy of, safety and infection control protocols, which in turn left the workers unprotected and lead to further spread.

11. The coronavirus itself poses a threat to life and safety. This case is not about that.  Rather, this case is about corporate executives who were aware of the risk associated with this virus, knew what safety precautions were needed, enforced those safety precautions as to existing residents (banning visitors and private duty nurses) and then willfully chose to ignore their own policies and warnings by admitting someone who by definition should not have been allowed in the front door. He travelled here from a known hot spot without isolating. This is not a story about the unforeseeable, unpreventable tragedies of a deadly virus. Rather, this is a story about the calculated boardroom decision to admit new residents in the midst of the pandemic because it was profitable to do so, and the further decision not to protect residents and staff by implementing proper screening and isolation protocols.

12. It was entirely foreseeable that COVID-19 would spread like wildfire through the halls of SILVERADO SENIOR LIVING - BEVERLY PLACE, given that there were not enough staff to isolate residents who exhibited symptoms or tested positive for the virus. The staffing burden increased when the SILVERADO DEFENDANTS made the decision that private duty caregivers, hired and paid privately by family members, could no longer come in the facility and provide one-on-one care. Without the extra eyes, ears, and hands of family and private caregivers, the entire care burden shifted to the SILVERADO SENIOR LIVING - BEVERLY PLACE staff and they did not increase their staffing levels to meet the need. In fact, while the virus was still spreading through May 2020, several staff members who worked selflessly through the crisis out of a sense of devotion to the seniors they were caring for, were abruptly laid off, likely because they were vocal about the lax safety and infection control protocols.

13. There are many heroes among our Country's caregivers, community workers, and healthcare providers, including the compassionate staff members at SILVERADO SENIOR

1   LIVING - BEVERLY PLACE who continued to care for their residents during a dark and scary
2   time. This case is not about them (although their service is to be commended and their devotion
3   likely saved lives). Rather, this case is about the greedy corporate executives who decided to
4   expose their own residents and staff to the deadly coronavirus in order to make even more profit
5   by admitting new residents during the pandemic, instead of focusing all their resources and
6   attention on caring for the residents they already had. They are not heroes. They have profited on
7   the backs of the most vulnerable members of our community, senior citizens and their families,
8   and on the backs of their overworked staff. The executives must be held accountable.

9                                           **PARTIES**

10      14. **Plaintiff**: ANNE PALAMIDES was born on June 27, 1965. She was at all times relevant
11  herein, a "dependent adult" as defined by Welfare & Institutions Code section 15610.23(b), and
12  had physical limitations restricting her ability to carry out normal activities and protect her rights
13  as discussed more fully *infra*. At all times relevant to this action herein, MS. PALAMIDES was
14  a resident of the State of California, County of Los Angeles.

15      15. **Guardian ad Litem**: ANNE PALAMIDES brings this lawsuit by and through her
16  daughter, EMILY MATCHETT as her Guardian ad Litem. An application for appointment of
17  EMILY MATCHETT as ANNE PALAMIDES's Guardian ad Litem is filed concurrently herein.

18      16. **Defendant LICENSEES:** Defendants SILVERADO SENIOR LIVING
19  MANAGEMENT, INC. and SUBTENANT 330 NORTH HAYWORTH AVENUE, LLC
20  ("LICENSEES") are the co-licensees of SILVERADO SENIOR LIVING - BEVERLY PLACE
21  (hereinafter "FACILITY"), a Residential Care Facility for the Elderly ("RCFE") operating at 330
22  N. Hayworth Avenue, Los Angeles, CA 90048.

23      17. SILVERADO SENIOR LIVING - BEVERLY PLACE is part of the Silverado brand – a
24  national chain operating facilities in seven states: California, Illinois, Texas, Utah, Virginia,
25  Washington, Wisconsin, twenty of which locations are in California. Silverado boasts "world-
26  class care that is recognized worldwide for an approach blending compassion and clinical

27

28

excellence"[2] for its residents, promising to provide "appropriate levels of care, amenities and programming to maximize quality of life and provide the highest levels of dignity possible."[3]

18. **Defendant SILVERADO SENIOR LIVING, INC.:** Upon information and belief, SILVERADO SENIOR LIVING, INC. is and was at all times relevant herein, the parent corporation of the Silverado enterprise. SILVERADO SENIOR LIVING, INC. exercises control over the management and policies of the facilities in the Silverado chain in California and other states. SILVERADO SENIOR LIVING, INC. controls the provision of administrative, legal services, and risk management services to each of its facilities, including SILVERADO SENIOR LIVING - BEVERLY PLACE.

19. **RCFE LICENSEE Duties**: An RCFE licensee is responsible for compliance with licensing requirements and the organization, management, operation, and control of the RCFE facility.  The general duties of a licensee are set forth in Title 22 of the California Code of Regulations, section 87100 *et seq.*  Certain duties are non-delegable including the responsibility for compliance with regulations and the management and control of the RCFE.  Delegation of authority by a licensee shall not diminish the responsibility of the licensee.  Therefore, even where a licensee delegates operational control to another person or entity, that licensee remains directly liable for management, operation, and control of the facility.  (Cal. Code Regs., tit. 22, § 87205.)

20. RCFEs are licensed and inspected by Department of Social Services (DSS) Community Care Licensing.  RCFEs are non-medical facilities and are not required to have nurses, certified nursing assistants, or doctors on staff.  These facilities are for people who are unable to live by themselves and who need custodial care and services, but do not need 24-hour nursing care.  The types of services usually provided by RCFEs include room and board, activities, transportation, medication administration, monitoring and observation for changes in condition, and ensuring access to medical care.  RCFEs must meet care, safety, and other standards mandated by the

---

[2] *Silverado Communities*, Silverado, <https://www.silverado.com/get-started/silverado-communities/> [as of Jun. 26, 2020].
[3] *Are There Limits to the Care Silverado Can Provide,* Silverado, <https://www.silverado.com/memory-care/are-there-limits-to-the-care-silverado-can-provide/>  [as of Jun. 26, 2020].

State of California in Health & Safety Code section 1569 et seq. and Title 22 of the California Code of Regulations, section 87100 *et seq.*

21. SILVERADO SENIOR LIVING MANAGEMENT, INC. and SUBTENANT 330 NORTH HAYWORTH AVENUE, LLC (as the licenses) were subject to the requirements of federal and state laws and regulations that govern the operation of an RCFE in California.  In connection with its operation of SILVERADO SENIOR LIVING - BEVERLY PLACE, SILVERADO SENIOR LIVING MANAGEMENT, INC. and SUBTENANT 330 NORTH HAYWORTH AVENUE, LLC have a substantial and ongoing caretaking and custodial relationship involving ongoing responsibility for the basic needs of its residents, including MS. PALAMIDES.

22. **Defendant LOREN SHOOK**:  Defendant LOREN SHOOK is and at all relevant times was the President, Chief Executive Officer, and Chairman of the Board at SILVERADO SENIOR LIVING MANAGEMENT, INC. He is also a director and managing agent of SILVERADO SENIOR LIVING, INC.

23. **Defendant JASON RUSSO**:  At all times relevant herein, JASON RUSSO was the Certified Administrator of SILVERADO SENIOR LIVING - BEVERLY PLACE.  An administrator is the person designated by the licensee to act on behalf of the licensee in the overall management of the facility.  (Cal. Code Regs., tit. 22, § 87101(a)(1).) All RCFE facilities are required to have a certified administrator.  (Cal. Code Regs., tit. 22, § 87405.)  That administrator shall have sufficient freedom from other responsibilities and shall be on the premises a sufficient number of hours to permit adequate attention to management and administration of the facility.  The administrator must meet certain minimum qualifications including, but not limited to, knowledge of the requirements for providing care and supervision appropriate to residents and knowledge of and ability to conform to the applicable laws, rules and regulations governing RCFEs.  An administrator has to complete a 40-hour training course which includes classroom instruction on the laws, regulations, policies and procedural standards impacting operations of an RCFE, and more specifically, admission, retention and assessment procedures.  This includes instruction on the laws and regulations governing restricted and

1   prohibited conditions, assessment and documentation of changes of condition, and ensuring that

2   a facility only accepts and retains residents whose needs can be met in the facility.  The

3   administrator has the responsibility and authority to carry out facility policies consistent with the

4   laws and regulations governing RCFEs, including admission, retention and assessment

5   procedures.  Further an administrator of an RCFE has the responsibility to administer the facility

6   in accordance with regulations and established policies and programs and to provide or ensure

7   the provision of services to residents with appropriate regard for the resident's physical and

8   mental well-being and needs, including those services identified in the residents' preadmission

9   appraisal.   These are well recognized administrator qualifications and responsibilities, set forth

10  in Cal. Code Regs., tit. 22, §§ 87405 and 87406. According to SILVERADO SENIOR LIVING -

11  BEVERLY PLACE's website, "The Administrator oversees and leads all aspects of the

12  community's operations. From overseeing daily functions, personnel and activities to spending

13  time each day with residents and families, Administrators are truly involved in every part of

14  making sure their community delivers topnotch care."[4]

15      24. **Unity of Interest:** Defendants are alter-egos of one another and form part of a single

16  enterprise under the Silverado brand. This enterprise is a network of licensees, shell entities and

17  holding companies, and management entities. Defendants, and each of them, are commonly

18  owned and controlled, sharing common officers, directors, and managing agents, including

19  LOREN SHOOK, Matthew McQueen, and Thomas Croal. Defendants make and approve key

20  decisions concerning SILVERADO SENIOR LIVING - BEVERLY PLACE's  day-to-day

21  operations, such as policies, staffing levels, employee training, hiring and firing, budgets and

22  related issues, which decisions and directives, on information and belief, were made at the

23  direction of and/or for the benefit of SILVERADO SENIOR LIVING, INC.

24      25. LOREN SHOOK and JASON RUSSO were actively engaged in day-to-day operations of

25  SILVERADO SENIOR LIVING - BEVERLY PLACE.  They determined staffing ratios and

26  made hiring, firing and training decisions. They were also in charge of allocation of facility

27

28  ---
[4] *Community Team,* Silverado, <https://www.silverado.com/memory-care/the-community-team/> [as of
Dec. 7, 2020].

resources, and set the facility's annual budget, including the budget for personnel.  They oversaw pre-admission appraisals and deciding whether someone could be admitted or retained in the facility based on licensing regulations, limitations on the types of services provided, limitations on the types of residents who can be admitted or retained, and limitations in numbers and qualifications in staff.

26. Defendants, and each of them, were jointly responsible to ensure that SILVERADO SENIOR LIVING - BEVERLY PLACE is and was operated in full compliance with federal and state laws and regulations governing operation of a RCFE, and for all aspects of the organization, management, operation and control of SILVERADO SENIOR LIVING - BEVERLY PLACE.

27. Upon information and belief, Defendants siphon funds and assets away from their facilities, including SILVERADO SENIOR LIVING - BEVERLY PLACE, through payment of management fees and other related-party transactions. Defendants indemnify, guarantee and subsidize one another and divert money that should be going to resident care into the pockets of their owners.

28. Injustice will result if the Court does not disregard the fiction of the separate entities.  . Defendants' fractured ownership and management structure is deliberately constructed in order to shield themselves from liability and to carry out their single enterprise with financial impunity. Defendants deliberately conceal and misrepresent the identity of the responsible ownership, management, and financial interests of SILVERADO SENIOR LIVING - BEVERLY PLACE in order to hide the flow of money and try to evade responsibility for their misconduct. If Defendants are not treated as a single enterprise or alter egos of each other, a severe injustice will result.

29. **Advance Knowledge/Authorization/Ratification:**  Because of the unity of interest and common ownership and control alleged herein, the acts of the LICENSEES were done pursuant to policies, practices, procedures, written or otherwise, established and implemented by and with the advance knowledge, acquiescence or subsequent ratification of SILVERADO SENIOR LIVING, INC., LOREN SHOOK, JASON RUSSO and/or Defendants' officers, directors and managing agents.

30. LOREN SHOOK personally engaged in policy-making at SILVERADO SENIOR LIVING - BEVERLY PLACE including, but not limited to, the visitation ban and the ban on outside private duty companions. On information and belief, LOREN SHOOK also personally adopted, approved and ratified the decision to admit Patient Zero with knowledge he came from an area of outbreak in New York and knowing he was not properly screened and isolated and knowing his workers were not adequately protected from disease if he brought coronavirus with him across the country.

31. Defendants' officers, directors and managing agents, and each of their tortious acts and omissions, as alleged herein, were done in concert and with each other and pursuant to a common design and agreement to accomplish a particular result, namely maximizing profits from the operation of the FACILITY.  Defendants' officers, directors and managing agents and each of them implemented a business plan to underfund, understaff, undertrain, and under-supervise the staff at the FACILITY.

32. Plaintiff's injuries arise out of the organization, management, operation, and control of SILVERADO SENIOR LIVING - BEVERLY PLACE by Defendants in their capacity as owner/operators/managers.  Defendants, and each of them, therefore share joint responsibility for Plaintiff's injuries.

33. **Doe Allegations:** To the extent any entity, person or company other than the defendants named herein owned, operated, managed, supervised, controlled, maintained, or were otherwise responsible for the business activities of SILVERADO SENIOR LIVING - BEVERLY PLACE, the identity of such persons or entities are unknown to Plaintiff and Plaintiff will seek leave to amend when those identities are ascertained. Plaintiff sues those persons/entities as DOES 1 through 10. Plaintiff is informed and believe, and thereon allege, that each of the defendants designated as a DOE is responsible in some manner for the events and happenings herein referred to and thereby legally caused the injuries and damages herein alleged. Such DOES would include officers, directors, controlling shareholders, partners, parent and/or sister companies, governing board members, and persons in *de facto* control of healthcare, operators, or employees of SILVERADO SENIOR LIVING - BEVERLY PLACE.

34. On information and belief, DOES 11 through 20 may be staff or contracted personnel of SILVERADO SENIOR LIVING - BEVERLY PLACE, including physicians, physician's assistants, nurse practitioners, licensed nurses, aides, social workers, business office personnel, or other administrative or clinical personnel including persons directly or indirectly responsible for provision of care, persons having made representations or warranties to Plaintiffs, and persons acting in concert with other Defendants. The identities of such persons or entities are unknown to Plaintiffs and Plaintiffs will seek leave to amend when those identities are ascertained. Plaintiff is informed and believes, and thereon alleges, that each of the defendants designated as a DOE is responsible in some manner for the events and happenings herein referred to and thereby legally caused the injuries and damages herein alleged.

35. On information and belief, DOES 21 through 25 include persons directly or indirectly responsible for provision of care to MS. PALAMIDES, including but not limited to physicians, medical groups, managed care organizations, acute care hospitals, home health agencies, visiting nurses, therapists, or other ancillary care providers who saw, examined, evaluated, observed or treated or failed to treat MS. PALAMIDES and/or persons having made representations or warranties to or from the Department of Social Services, the Department of Public Health, the Long Term Care Ombudsman, Adult Protective Services, Cedars Sinai Medical Center, SILVERADO SENIOR LIVING - BEVERLY PLACE, and/or anyone purporting to act on behalf of or concert with these persons or entities. The identities of such persons or entities are unknown Plaintiffs and Plaintiffs will seek leave to amend when those identities are ascertained. Plaintiff is informed and believes, and thereon alleges, that each of the defendants designated as DOE is responsible in some manner for the events and happenings herein referred to and thereby legally caused the injuries and damages herein alleged.

## JURISDICTION AND VENUE

36. This Court has jurisdiction over the cause of action asserted.

37. The acts alleged in this complaint occurred in the County of Los Angeles.

38. The Defendants and each of them have sufficient minimum contacts in California based on their residency in California or otherwise intentionally avail themselves of the California

12

**COMPLAINT FOR DAMAGES**

market though their provision of services in the County of Los Angeles, so as to render them essentially at home in California and making the exercise of jurisdiction by the California courts consistent with traditional notions of fair play and substantial justice.

39. Venue is proper in the County of Los Angeles under Code of Civil Procedure § 395(a) based on the facts, without limitation, that this Court is a court of competent jurisdiction, that the defendants reside in the County of Los Angeles, and that all of the events described occurred in the County of Los Angeles.

**FACTUAL BACKGROUND**

A.  **Coronavirus Background**

40. On January 20, 2020, the first case of coronavirus infection in the United States appeared. On March 4, 2020, California's Governor, Gavin Newsom, declared a state of emergency in California. On the same day, the Los Angeles County Board of Supervisors and the Los Angeles County Department of Public Health similarly declared a local and public health emergency in the County of Los Angeles. On March 7, 2020, Governor Andrew Cuomo declared a State of Emergency in the state of New York.

41. It quickly became known that the elderly, and particularly those with underlying health problems were most vulnerable to the coronavirus. The CDC, CDPH, and CDSS all put forth requirements, and guidelines for nursing homes and assisted living providers/RCFEs to promptly take reasonable measures to protect their patients from exposure to the coronavirus. Such measures include testing of residents and employees, restricting visitors, requiring employees to use face masks, gloves, and gowns, and isolating employees and residents who are suspected or known carriers of the virus.

42. Media coverage of the coronavirus pandemic was everywhere, and certain parts of the country and the world were thrust to the forefront. Starting in Wuhan, China, virus coverage

quickly shifted to Italy, where the entire country was placed on lockdown on March 9 due to an exploding number of cases that left Italy's hospitals in a state of wartime triage.[5]

43. The next global hotspot to emerge was New York.  On March 10, New York ordered a one-mile radius containment zone in Westchester County's New Rochelle – less than 20 miles from Manhattan. On March 16, 2020, Governor Cuomo issued an executive order closing all schools statewide, limiting recreational and social gatherings to 50 people, and closing restaurants, bars, movie theaters, gyms and casinos. On March 17, 2020, Mayor Bill de Blasio announced that the city should prepare for a possible shelter-in-place order. By March 18, the number of cases in New York statewide had spiked to 4,152. On March 19, Mayor Bill de Blasio reported "an explosion of cases here in New York City," adding that the city has been ramping up its testing in recent days[6] On March 20, Cuomo ordered all nonessential businesses closed statewide.

**B.  COVID-19 Precautions at SILVERADO SENIOR LIVING - BEVERLY PLACE**

44. Meanwhile, at SILVERADO SENIOR LIVING - BEVERLY PLACE, Defendants began making representations that they too were taking the virus seriously and implementing precautions as recommended by the CDC and CDPH.  On March 14, 2020, residents at SILVERADO SENIOR LIVING - BEVERLY PLACE received a mass email from JASON RUSSO limiting visitors and requiring strict screening for family members. The message stated:

> [T]hrough an enormous abundance of caution for our residents that our families postpone all visits for the next 2 weeks unless it is absolutely necessary. **We are putting our residents at significant risk by exposing them to what may come through the front door with a visit.** Our goal is to reduce exposure and we can only do that if we postpone the visit. I do appeal to your common sense and ask that you think first about the safety of your loved one and all the residents at Beverly Place.

---

[5] Mounk, *The Extraordinary Decisions Facing Italian Doctors,* The Atlantic (Mar. 11, 2020) <https://www.theatlantic.com/ideas/archive/2020/03/who-gets-hospital-bed/607807/> [as of Nov. 19, 2020].

[6] Feuer, et al., *Coronavirus: NYC has 3,615 Confirmed Cases, Including an Inmate at Rikers Island, Mayor de Blasio Says*, CNBC (Mar. 19, 2020 <https://www.cnbc.com/2020/03/19/new-york-city-has-3615-confirmed-coronavirus-cases-including-an-inmate-at-rikers-island-mayor-de-blasio-says.html> [as of Nov. 19, 2020].

(emphasis added)

45. The next day, March 15, 2020, JASON RUSSO sent out another email stating that private duty companions hired by families were henceforth restricted.

**C. <u>Admission of Patient Zero</u>**

46. Meanwhile, although SILVERADO SENIOR LIVING - BEVERLY PLACE closed its doors to family and friends from visiting, as of March 19, 2020, Defendants were still allowing the admission of new residents.

47. On March 19, 2020, Patient Zero was flown in from New York City and admitted to the independent wing of the facility. No isolation measures were implemented and Patient Zero was allowed to roam freely throughout the facility unattended.

48. The next day, March 20, 2020, Patient Zero was sent to the hospital due to his symptoms. The following day, he tested positive for COVID-19, unbeknownst to anyone else at the facility.

49. SILVERADO DEFENDANTS concealed Patient Zero's condition, and the fact that Patient Zero had exposed other residents at the facility. Meanwhile, MR. RUSSO and MR. SHOOK continued to reassure residents and their families that they were doing "everything in their power" to manage the crisis and keep residents safe. In a letter to families of SILVERADO SENIOR LIVING - BEVERLY PLACE residents dated March 21, 2020 and emailed around 7:14 PM, LOREN SHOOK acknowledged: "We fully understand that in light of an asymptomatic incubation period and the presence of mild and asymptomatic disease already endemic in the larger community, COVID-19 will get into our memory care communities." When he wrote this, he already knew Patient Zero was positive, but he did not share that. He continues, "we have and will be taking significant precautions and continuing to make adjustments to do all we can to limit our resident's exposure and flatten the curve." The next morning, on March 22, 2020 at approximately 9AM, MR. SHOOK distributed an email again to the families of SILVERADO SENIOR LIVING - BEVERLY PLACE, stating, "As we anticipated with my last communication, we learned tonight that a resident who recently moved into The Loft has tested positive for Covid-19". The letter falsely claims that Patient Zero was confined to his room since he was admitted to the facility.

50. In the days and weeks that followed, at least 58 residents and 39 employees have since come down with the virus, at least fourteen of whom have died.[7]

**D.  MS. PALAMIDES**

51. MS. PALAMIDES was admitted to SILVERADO SENIOR LIVING - BEVERLY PLACE on November 1, 2019. She suffered from bipolar disorder and memory problems. She also had a history of pulmonary embolisms and was on blood thinners, which put her at high risk for coronavirus.

52. MS. PALAMIDES' family was extremely worried about her risk of contracting the virus, and emphasized this to the SILVERADO DEFENDANTS. MS. PALAMIDES' family asked the SILVERADO DEFENDANTS to tell them of any known infections and which floors they were located on, so that they could ensure MS. PALAMIDES avoided those areas. The SILVERADO DEFENDANTS refused to share that information, citing patient privacy.

53. Furthermore, because of her mental and psychiatric diagnoses, MS. PALAMIDES was easily disturbed by others, and for that reason, her family paid to have her in a private room to avoid mental and emotional distress.

54. However, some time in April, MS. PALAMIDES was moved from her single room into a double room with a roommate. Her family was not informed of this change, either before or after it was made. Instead, they learned of the room change later from MS. PALAMIDES. On information and belief, SILVERADO DEFENDANTS did not screen MS. PALAMIDES's roommate for COVID-19 prior to moving her into a shared room.

55. Soon thereafter, MS. PALAMIDES tested positive for COVID-19. Again, MS. PALAMIDES' family was not informed. Instead, they found out from MS. PALAMIDES herself. As a result of her COVID-19 positive test, MS. PALAMIDES was then moved a second time to a different room in order to quarantine.

---

[7] *COVID-19 Positive Cases in Adult and Senior Care Facilities*, COVID-19 Information and Resources, <https://www.cdss.ca.gov/inforesources/cdss-programs/community-care-licensing/covid-19-information-and-resources> [as of Nov. 19, 2020].

56. As a direct and proximate result of the conduct as described herein by the SILVERADO DEFENDANTS, and each of them, MS. PALAMIDES suffered extreme mental and emotional distress which impacted her health.

### FIRST CAUSE OF ACTION

**(Elder Abuse and Neglect by Plaintiff ANNE PALAMIDES, by and through her Guardian ad Litem, EMILY MATCHETT, as against all Defendants)**

57. Plaintiff hereby incorporates by reference Paragraph 1 through 56 of this Complaint as though fully set forth herein.

58. **Dependent Adult:** MS. PALAMIDES, at all relevant times, had physical or mental limitations that restricted her ability to carry out normal activities or to protect her rights, and was a "dependent adult" as defined by Welfare & Institutions Code section 15610.23(b).

59. **Substantial Caretaking and Custodial Relationship:** By virtue of her residence and reliance on staff for assistance with all activities of daily living, Defendants, and each of them, were in a substantial caretaking and custodial relationship with MS. PALAMIDES while she was a resident at SILVERADO SENIOR LIVING - BEVERLY PLACE.  As such, Defendants, and each of them, had responsibility for meeting MS. PALAMIDES's basic needs including protection from the health and safety hazard posed by COVID-19.

60. **Duties:** Defendants, and each of them, owed a duty to MS. PALAMIDES to provide care and services that met her needs and were in accordance with the laws and regulations governing RCFEs, including but not limited to:

(a) The duty to accept and retain only residents for whom they could provide adequate care (Cal. Code Regs., tit. 22, §§ 87582, 87589(a)(4));

(b) The duty to reappraise residents who have significant physical and mental changes of condition (Cal. Code Regs., tit. 22, § 87587(a));

(c) The duty to notify family and physician of significant changes in a resident's health and document those changes (Cal. Code Regs., tit. 22, §§ 87572(a)(8), 87587(b) and (c));

(d) The duty to maintain complete and current records of each resident (Cal. Code Regs., tit. 22, § 87506);

(e) The duty to provide adequate staffing to meet residents' needs (Cal. Code Regs., tit. 22, § 87565(a));

(f) The duty to provide adequate assistance and care to meet residents' needs as identified in the pre-admission appraisal and for other basic services including safe accommodations and regular observation of physical and mental conditions (Cal. Code Regs., tit. 22, § 87578(a), 87590(d) and (f));

(g) The duty to timely transfer residents to a higher level of care when they can no longer receive adequate care at a residential care facility (Cal. Code Regs., tit. 22, § 87589(a)(4));

(h) The duty to regularly observe residents for changes in physical, mental, emotional, and social functions and to provide appropriate assistance when such observation reveals unmet needs (Cal. Code Regs., tit. 22, § 87591);

(i) The duty to treat residents at all times as individuals, with dignity and respect (Cal. Code Regs., tit. 22, § 87572(a));

(j) The duty to provide and maintain safe accommodations (Cal. Code Regs., tit. 22, §§ 87572(b), 87577(d));

(k) The duty to arrange for appropriate medical care to meet the conditions and needs of residents, including emergency care (Cal. Code Regs., tit. 22, §§ 87575(a)(1), (a)(2), and (f)); and

(l) The duty to immediately call 911 if an injury or other circumstance has resulted in an imminent threat to a resident's health (Cal. Code Regs., tit. 22, § 87575(g)).

61. **Neglect:** Defendants, and each of them, committed elder neglect as defined in the Elder Abuse and Dependent Adult Civil Protection Act (Welfare and Institutions Code section 15610.57) by failing to protect MS. PALAMIDES from health and safety hazards.  Defendants failed to protect MS. PALAMIDES from health and safety hazards when they allowed admission of a new resident, who would fly here on a commercial airplane from a location known to have an outbreak of COVID-19, to enter the facility without implementing appropriate isolation, screening, or protective measures.

62. **Reckless conduct and conduct undertaken in conscious disregard of a high probability of injury:** The conduct of Defendants was reckless and undertaken in conscious disregard of the high probability of injury to MS. PALAMIDES.  The misconduct and neglect described herein was undertaken in blatant disregard of recommendations by the CDC, the CDSS, health officials and their own internal recommendations, demonstrating a callous indifference to the outcome.  The breaches were undertaken in an environment (i.e. care for vulnerable disabled and elderly persons) where everyone involved in caring for these folks knows of the high risk of death this disease poses to the elderly and immunocompromised.

63. Defendants' willful failure to protect MS. PALAMIDES from health and safety hazards, as described, constitutes recklessness, malice, oppression, and/or fraud within the meaning of Welfare & Institutions Code § 15657.

64. **Fraud in the Commission of Elder Neglect:** Defendants concealed the fact that new residents would be admitted after the facility shut down to families and visitors. Defendants also concealed Patient Zero's condition from their staff, residents, and residents' families and in doing so concealed the fact that they had been exposed to the virus, all the while communicating that they were taking the virus seriously and taking precautions to protect residents from its spread. MS. PALAMIDES and her family had no way of knowing that Patient Zero was being flown in, or of his medical history and symptoms. Rather, they relied on Defendants to keep MS. PALAMIDES and the other residents safe.  Had Defendants reported to MS. PALAMIDES and her family members, they would have been in the position to make alternative arrangements to provide a safe and exposure-free environment for MS. PALAMIDES.

65. **Corporate Directives and Understaffing:** Defendants engaged in direct neglect by making a conscious choice to admit Patient Zero, as described herein. Defendants also engaged in direct neglect by making a choice to understaff the facility, in both quantity and quality of nursing personnel.  The decision to understaff was made at the management level by the SILVERADO DEFENDANTS in order to increase the profitability of the RCFE, in conscious disregard of resident care needs.  Defendants, together with their directors, officers and managing agents, conceived of and implemented a plan to increase business profits at the

expense of residents like MS. PALAMIDES, and other FACILITY residents.  Integral to this plan was the practice and pattern of Defendants continuing to admit new residents, but not increasing staffing levels to implement safety and infection protocols and keep existing and new residents safe from the virus.  DEFENDANTS instead chose to staff the facility with an insufficient number of care personnel, many of whom were not properly trained nor given the proper protective equipment and sanitation supplies to keep themselves and the residents safe. The understaffing and lack of training and supplies was designed to reduce labor costs, equipment and supply costs, and to increase profits, and resulted in the neglect of many residents of the facilities including, MS. PALAMIDES.  This corporate policy to not maintain sufficient staffing, not provide adequate training, and not to provide equipment and supplies for infection control, as required by law, was developed and implemented with the conscious disregard for the likelihood of physical harm and injury to those who it is in the business to protect, including MS. PALAMIDES, who did in fact suffer as a direct consequence of Defendants' proprietary interests, which it placed above that of her and other residents.

66. As a direct and proximate result of DEFENDANTS' misconduct, MS. PALAMIDES contracted the coronavirus and she needlessly suffered great harm and injury.

67. As a proximate result of the abuse and neglect of MS. PALAMIDES by Defendants, Plaintiff was caused to incur medical expenses and other related expenses, the full nature, extent and amount of which are not yet known to Plaintiff, and leave is requested to amend this Complaint when the same are ascertained to conform to proof at the time of the trial.

68. As a proximate result of the abuse and neglect of MS. PALAMIDES by Defendants, MS. PALAMIDES suffered fear, anxiety, humiliation, physical pain and discomfort, and emotional distress, all to her general damage in a sum to be established.

69. By the conduct, acts and omissions of Defendants, as alleged above, they are guilty of recklessness, fraud, oppression, and/or malice.  The specific facts set forth above show a disregard of the high probability that MS. PALAMIDES would be injured.  In addition to special damages, Plaintiff is therefore entitled to an award of the reasonable attorney's fees and costs incurred in prosecuting this case as well as MS. PALAMIDES's physical and mental pain and

suffering and punitive damages pursuant to Welfare & Institutions Code section 15657 and Civil Code section 3294.

70. By the conduct, acts and omissions of Defendants, as alleged above, they have engaged in unfair business practices directed at the elderly.  MS. PALAMIDES is therefore entitled to treble damages pursuant to Civil Code section 3345.

**SECOND CAUSE OF ACTION**

**(Negligence by Plaintiff ANNE PALAMIDES, by and through her Guardian ad Litem,**

**EMILY MATCHETT, as against all Defendants)**

71. Plaintiff incorporates herein by reference paragraphs 1 through 70 of this Complaint as though fully set forth.

72. The SILVERADO DEFENDANTS owed a duty of care to MS. PALAMIDES to act reasonably in the discharge of their duties including but not limited to hire, retain, and train sufficient staff to provide her with necessary care and services based on assessment and recognition of her individualized care needs; a duty to protect her from health and safety hazards; a duty to observe and report changes of condition to family and physicians; and a duty to ensure she does not suffer needlessly.

73. The SILVERADO DEFENDANTS breached their duties as described herein.

74. As a proximate result of the negligent conduct as alleged against SILVERADO DEFENDANTS and breaches of the duty owed to plaintiffs and decedent, and breaches of the standard of care owed, MS. PALAMIDES suffered grave personal injury and needless suffering, as described herein, as well as special damages, according to proof.

75. Pleading in the alternative, as a proximate result of the wrongful and neglectful conduct of the SILVERADO DEFENDANTS, including but not limited to the allegations of neglect, and acts or omissions undertaken with recklessness, malice, oppression and/or fraud, MS. PALAMIDES suffered grave personal injury and needless suffering, as described herein, as well as special damages, according to proof.

///

///

**COMPLAINT FOR DAMAGES**

**RELIEF REQUESTED**

On the First Cause of Action: Elder Abuse and Neglect

1. For general damages in an amount in excess of the minimum jurisdiction of this court;

2. For special damages including past hospital, medical, professional and incidental expenses, according to proof;

3. For attorney's fees and costs pursuant to Welfare & Institutions Code § 15657 and according to proof;

4. For exemplary damages pursuant to Welfare & Institutions Code § 15657 and Civil Code § 3294;

5. For treble damages pursuant to Civil Code § 3345;

On the Second Cause of Action: Negligence

1. For general damages in an amount in excess of the minimum jurisdiction of this court;

2. For special damages including past hospital, medical, professional and incidental expenses, according to proof;

On all counts

1. For costs of suit;

2. Whatever further relief the court may find just and proper.


Dated: December 9, 2020                           JOHNSON MOORE


                                        By: _____
                                              Jody C. Moore
                                              Joanna A. Hutchins
                                              Attorneys for Plaintiffs

**COMPLAINT FOR DAMAGES**